CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

JAN 0 8 2008

JOHN F. CORCORAN, CLERK
BY: /s/
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

|  |  |
|---|---|
| **JAMES MILLER,** | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 2:07cv00019 |
| | ) |
| v. | ) **MEMORANDUM OPINION** |
| | ) |
| **MICHAEL J. ASTRUE,** | ) |
| **Commissioner of Social Security,**[1] | ) By: GLEN M. WILLIAMS |
| Defendant. | ) SENIOR UNITED STATES DISTRICT JUDGE |

In this social security case, the court affirms the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

The plaintiff, James Miller, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Miller's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2007). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, and is, therefore, substituted for Jo Anne B. Barnhart as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d)(1).

(4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Miller filed his application for DIB on or about April 21, 2005, (Record, ("R."), at 14),[2] alleging disability as of May 15, 2004, due to a compressed disc in his back, pinched nerves and flare up of gout. (R. at 24, 189.) The claim was denied initially and upon reconsideration. (R. at 24-28, 32-34.) Miller then timely requested a hearing before an administrative law judge, ("ALJ"). (R. at 14, 36.) The ALJ held a video hearing on April 6, 2006, at which Miller was represented by counsel. (R. at 14, 184-203.)

By decision dated January 19, 2006, the ALJ denied Miller's claim. (R. at 12-20.) The ALJ found that Miller met the insured status requirements of the Act through December 31, 2008. (R. at 16-20.) The ALJ determined that Miller had not engaged in substantial gainful activity at any time relevant to his decision, and that Miller had severe impairments of "degenerative disc disease in [his] cervical and lumbar spine with disc bulges." (R. at 16-20.) The ALJ also found that Miller did not have an impairment or combination of impairments that meets or medically equals the criteria of any impairments listed at or medically equal to one listed at 20 C.F.R. Part 404,

Case 2:07-cv-00019-GMW-PMS   Document 12-1   Filed 01/08/08   Page 2 of 21   Pageid#: 41

Subpart P, Appendix 1. (R. at 16-17.)

The ALJ determined that Miller had the residual functional capacity, ("RFC"), to sit, stand and walk up to six hours in a typical eight-hour workday, and that Miller could lift and carry items weighing up to 10 pounds frequently and 20 pounds occasionally. (R. at 17.) The ALJ further determined that Miller could not climb ropes, ladders or scaffolds, but could occasionally climb stairs and ramps and could stoop, kneel, crouch and crawl. (R. at 17-18.) The ALJ found that Miller could tolerate exposure to hazards such as heights and moving machinery. (R. at 17-18.) The ALJ also found that Miller was unable to perform any of his past relevant work. (R. at 18.) Based on Miller's age, education, work experience and RFC, along with expert vocational testimony, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Miller could perform. (R. at 19-20.) Thus, the ALJ found that Miller was not disabled at any time through at least the date of the ALJ's decision. (R. at 20.) *See* 20 C.F.R. § 404.1520(g) (2007).

After the ALJ issued his decision, Miller pursued his administrative appeals but the Appeals Council denied review, thereby making the ALJ's decision the final decision of the Commissioner. (R. at 5-8, 183.) *See* 20 C.F.R. § 404.981 (2007). Thereafter, Miller filed this action seeking review of the ALJ's unfavorable decision. The case is before this court on Miller's Motion for Summary Judgment filed on September 5, 2007, and on the Commissioner's Motion for Summary Judgment filed on October 5, 2007.

---

[2] Miller's application is not included in the administrative record, but is referred to in the

3

## II. Facts

Miller was born in 1967, which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c) (2007). (R. at 18-19.) According to the record, Miller has a ninth grade education, and he can read, write and communicate in English. (R. at 19, 187.) In addition, Miller has past relevant work experience as a truck driver. (R. at 18.)

At Miller's hearing before the ALJ on April 6, 2006, Miller testified that he worked as a truck driver from 1992 to 2004, and that he worked as a surveyor for three years before he became a truck driver. (R. at 188-89.) When Miller worked as a truck driver, he transported cargo both long distance and local, and he lifted items weighing over 100 pounds. (R. at 188.) During Miller's work as a surveyor, he worked mainly as a rodman, clearing lines for surveying teams. (R. at 189.) Miller testified that he injured his back and his neck in two different car accidents. (R. at 189-90.) The first accident took place around 1987 and resulted in injuries to Miller's lower back, and the second accident took place in 1999 and resulted in injuries to his neck. (R. at 189-90.) Miller described his back pain as a constant pain, with sharp pains originating from his back and radiating down one or the other leg. (R. at 190-91.) He stated that his back pain affects both his ability to walk on hard surfaces and his ability to sit still for long periods. (R. at 191.)

Miller described his neck pain as a constant pain with sporadic burning or stabbing sensations, which he noted can cause him to lose control of his head. (R. at

---

Administrative Law Judge's opinion.

4

192.) Miller also noted that his neck pain has caused him to lose control of his left arm at times, causing him to be unable to lift or move it. (R. at 192.) Miller testified that he has to move around constantly, even on good days, to help ease his back and neck pain. (R. at 191.) In addition, Miller stated that his back pain is constantly getting worse and that steroidal injections only temporarily relieve the pain. (R. at 194-95.) Miller testified that he could perform some household chores, such as laundry, mowing with a riding mower, helping with the groceries, mopping or sweeping. (R. at 194-96.) He explained that his ability to complete these chores varies from time to time. (R. at 194-96.)

Miller also testified that he has gout in his right foot, ankle and toes, and that gout is the most painful thing he has had to deal with it. (R. at 196.) Miller testified that his gout flare-ups cause him to be unable to sleep, walk or wear shoes. (R. at 196-97.) Miller testified that on a typical "good" day, he wakes at about seven or eight o'clock, takes his medication, drinks coffee, and sits on the couch and watches a lot of television. (R. at 198-99.) On a bad day, Miller stated that he stayed in bed or on the couch all day. (R. at 198-99.) Miller denied belonging to any social clubs or attending church. (R. at 199.)

Gerald K. Wells, a vocational expert, also testified at Miller's hearing. (R. at 200-03.) Wells described Miller's past work as a truck driver as heavy,[3] semi-skilled

---

[3] Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carry of items weighing up to 50 pounds. *See* 20 C.F.R. § 404.1567(d) (2007). If an individual can perform heavy work, he also can perform medium, light and sedentary work. *See* 20 C.F.R. § 404.1567(d) (2007).

5

work, and described Miller's past work as a rodman in a surveying team as medium,[4] semi-skilled work, according to the Dictionary of Occupational Titles, ("DOT"). (R. at. 201.) The ALJ asked Wells to consider a hypothetical individual of the same age, education, background and experience as Miller, who would be able to occasionally lift items weighing up to 20 pounds, frequently lift items weighing up to 10 pounds and who would be able to sit, stand and walk for about six hours in a typical eight-hour workday. (R. at 201.) The ALJ asked Wells to assume further that the hypothetical individual would be unable to climb ladders, ropes or scaffolds, but be able to occasionally use ramps, climb stairs, stoop, kneel, crouch and crawl. (R. at 201.) Based on the hypothetical individual described, the ALJ asked Wells if such an individual would be employable in the national and regional economies. (R. at 201.) Wells testified that the hypothetical individual could perform jobs that required the individual to perform either light[5] or sedentary[6] work. (R. at 201.) Wells testified that the hypothetical individual could work as a dispatcher, and that there are 125,000 dispatcher jobs in the national economy and 200 of these kinds of jobs in Virginia. (R. at 201.) Wells also testified that the hypothetical individual could perform the job of a cashier, and that there are over three million cashier jobs in the national economy and

---

[4] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting of items weighing up to 25 pounds. *See* 20 C.F.R. § 404.1567(c) (2007). If an individual can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2007).

[5] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. *See* 20 C.F.R. § 404.1567(b) (2007). If an individual can perform light work, he can also perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2007).

[6] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. *See* C.F.R. § 404.1567(a) (2007).

6

94,000 of these kinds of jobs in Virginia. (R. at 201-02.) Lastly, Wells testified that the hypothetical individual could perform the job of a security guard, and that there are over a million security guard jobs in the national economy and 24,000 of these kinds of jobs in Virginia. (R. at 202.)

After the ALJ completed his questioning, Miller's counsel asked Wells to consider the ALJ's hypothetical individual, and additionally to consider the hypothetical individual to have the severity of the complaints described by Miller at the proceeding. (R. at 202.) Based on this modified hypothetical individual, Miller's counsel asked Wells if there would be any jobs available in the national economy for such an individual. (R. at 202.) Wells responded by noting that the modified hypothetical individual would miss well over one day per month, making it difficult to sustain competitive work on a full time basis. (R. at 202-03.)

In rendering his decision, the ALJ reviewed records from Valley Health System; Stephen M. Saleeby, D.C.; Dr. William Ball, M.D.; The Center for Advanced Imagining; Dr. James M. Leipzig, M.D.; Dr. Murray E. Joiner, Jr., M.D., P.C.; Professional Therapies; Dr. William W. Martin, Jr., M.D., a state agency physician; and Dr. Tony Constant, M.D., a state agency physician.

The record shows that Miller presented to the emergency room, ("ER"), at Valley Health System on August 24, 2001, complaining of a sharp, severe pain in his left shoulder and neck. (R. at 92-95.) Miller was diagnosed with a cervical sprain and was advised to apply heat to the area. (R. at 94.) An x-ray of Miller's cervical spine on the same date revealed minimal narrowing of the neural foramen on the right at C4-

7

5, no visible bony abnormalities and a normal alignment of the spine. (R. at 95.)

The record lacks any medical records after Miller's August 2001 ER visit until March 8, 2004, when Miller presented to Stephen M. Saleeby, D.C., complaining of constant and severe neck and arm pain on the left side and frequent and severe upper back pain. (R. at 98.) Miller reported his back pain as being equal to level 10 pain on a 10-point scale and noted that, while his acute symptoms began several days prior to his visit, he had experienced severe, episodic pain since a motor vehicle accident in 1999, in which he fractured his C2 vertebra. (R. at 98.) An examination of Miller's systems revealed decreased range of motion, ("ROM"), in the cervical spine, accompanied by extreme discomfort at 10 degrees flexion and extension, 15 degrees left lateral flexion, 20 degrees right lateral flexion and right rotation and 30 degrees left rotation. (R. at 98.) Saleeby's examination also revealed normal ROM of the cervical spine, but significant palpable paraspinal muscle spasms, tautness and tenderness on the left side of the neck, shoulder and back area and degenerative joint and disc disease in the cervical spine. (R. at 98.) Miller was diagnosed with "severe, chronic/acute cervicobrachial syndrome on the left side cervicalgia, myofascitis on the left side complicated by post-traumatic cervical disc degeneration, occipitocervical subluxation and cervicothoriacic subluxations." (R. at 98.)

Miller returned to Saleeby on August 17, 2004, complaining of intermittent and moderate neck and interscapular pain on the left side and arm pain on the left side. (R. at 97.) Saleeby reported that Miller was gradually improving since the initial visit and after eight treatments. (R. at 97.) Miller reported that he was feeling better until three to four weeks prior to the visit, when his symptoms returned. (R. at 97.) Miller

8

informed Saleeby that he was no longer driving a truck because of his pain, which was equivalent to a level eight pain on a ten-point scale. (R. at 97.) An examination of Miller's systems revealed decreased ROM in the cervical spine, accompanied by extreme discomfort at 15 degrees flexion, 20 degrees extension, 20 degrees left lateral flexion, 25 degrees right lateral flexion, 35 degrees left rotation and 25 degrees right rotation. (R. at 97.)

Miller returned to Dr. Saleeby on February 3, 2005, with chief complaints of frequent and severe neck and arm pain on the left side. (R. at 96.) Saleeby noted that Miller appeared to be progressing as anticipated, and that Miller should continue treatment as recommended. (R. at 96.) An examination of Miller's systems revealed decreased ROM in the cervical spine, accompanied by extreme discomfort at 20 degrees flexion, 30 degrees extension, 25 degrees left lateral flexion, 30 degrees right lateral flexion, 45 degrees left rotation and 50 degrees right rotation. (R. at 96.)

Dr. William Ball, M.D., treated Miller from May 17, 2004, through September 20, 2005, for symptoms related to Miller's alleged disabilities.[7] (R. at 101-06, 165-175.) On May 17, 2004, Dr. Ball completed a "Medical Examination Report for Commercial Driver Fitness Determination," ("MER"), for Miller. (R. at 107-09.) The MER noted that Miller had a previous spinal injury or disease, namely a broken neck in February 1999, but also noted that Miller had no significant problems as a result of this injury. (R. at 107.) Dr. Ball also reported no abnormalities in Miller's musculosketal system. (R. at 109.)

---

[7] Dr. Ball's records are in large part illegible.

Case 2:07-cv-00019-GMW-PMS   Document 12-1   Filed 01/08/08   Page 9 of 21   Pageid#: 48

Miller again presented to Dr. Ball on October 27, 2004, complaining of right ankle pain. (R. at 102.) Dr. Ball ordered x-rays of Miller's right ankle, along with blood tests to detect the presence of gout. (R. at 102, 105.) On October 29, 2004, blood test results from the Laboratory Corporation of America revealed a positive result for gout. (R. at 114.) Miller also presented to Dr. Ball on March 9, 2005, complaining of neck and back pain. (R. at 101.) On that date, Dr. Ball ordered that x-rays be taken of Miller's spine. (R. at 105.)

A magnetic resonance image, ("MRI"), was taken on March 17, 2005, of Miller's cervical spine. (R. at 117-19.) This MRI revealed the vertebral bodies to be well aligned and to be essentially normal in height and signal intensity throughout. (R. at 118.) The MRI also revealed a disc protrusion toward the left at the C4-5 level of the spine and fairly marked bony productive changes in association. (R. at 118.) A magnetic resonance angiogram, ("MRA"), was also taken on March 17, 2005, of the base of Miller's skull and of the Circle of Willis. (R. at 116.) The MRA revealed congenital fetal circulation on the right and a diminutive right A1 segment. (R. at 116.)

On April 11, 2005, Miller was evaluated by Dr. James M. Leipzig, M.D. (R. at 120-21.) Miller reported to Dr. Leipzig that he had a C2 fracture in 1999 as a result of a car accident, and that his treatment for this injury went well. (R. at 120.) Miller noted, however, that about a year prior to his visit he looked up sharply and re-injured his neck. (R. at 120.) Miller also reported occasional loss of the use of his left upper extremity. (R. at 120.) Dr. Leipzig found that Miller's cervical ROM was unrestricted, his knee and ankle reflexes were 2/3 bilaterally, his plantar reflexes were "downgoing,"

10

his biceps and triceps reflexes were 2/3 bilaterally and his sensory and motor testing were normal bilaterally on all levels of the spine. (R. at 120.) Dr. Leipzig indicated that Miller's radiographs showed no evidence of C1-2 instability, no evidence of a C2 fracture and no evidence of disc degeneration. (R. at 120.) He did note, however, that an MRI dated March 17, 2005, demonstrated a small left C4-5 disc protrusion. (R. at 120.) Dr. Leipzig also noted that he found no obvious pathology, indicated that he would not address the C4-5 level of the spine protrusion and suggested physical therapy. (R. at 121.)

On April 27, 2005, Miller presented to Dr. Murray E. Joiner, Jr., M.D., complaining of neck and lower back pain. (R. at 141-45.) Miller reported intermittent sharp neck pain in the central upper cervical spine at approximately C2-3, intermittent numbness and loss of use of his left upper extremity, intermittent radiation of pain into the proximal left deltoid and headaches occurring every few weeks as a result of his neck pain. (R. at 142.) Miller also reported intermittent low back pain, which was more frequent but less intense than his neck pain complaints. (R. at 142.) Miller reported his back pain as a near constant achy type pain with intermittent "shooting pain" in the posterior left lower extremity to the mid thigh. (R. at 142.) Dr. Joiner's physical examination revealed no visible or palpable bony abnormalities, decreased cervical and lumbar lordosis, a full active ROM throughout Miller's systems, mild "left greater than right" lumbar paraspinal tenderness with increased tone greatest at left L3-4, L4-5, mild increased pain with lumbar extension, a negative sitting straight leg raise test, intact cranial nerves and 2/4 deep tendon reflexes. (R. at 143-44.) Dr. Joiner also noted that an MRI of the cervical spine dated March 17, 2005, revealed prominent left paracentral and lateral disc protrusion at C4-5 and narrowing of the subarachnoid space

11

and mild encroachment upon the left neuroforamen. (R. at 144.) The MRI also revealed disc or discophyte complex posterolateral towards the left at C5-6 with minimal encroachment upon the canal medial aspect of the left neuroforamen. (R. at 144.) Dr. Joiner diagnosed Miller with chronic low back pain and spasms, intermittent left lumbar lower extremity pain, chronic neck pain, cervical clinical disc disease of unknown clinical significance and an asymptomatic left C4-5, C5-6 disc protrusion. (R. at 144.) Dr. Joiner prescribed Miller a Medrol Dose Pak, Norflex, Cataflam and Ultracet, ordered an MRI of Miller's lumbar spine and instructed Miller to enroll in physical therapy. (R. at 145.) An MRI of Miller's lumbar spine dated May 17, 2005, revealed that Miller had degenerative changes and a mild disc bulge at L1-2, a moderate central disc bulge at L4-5 with evidence of a posterior annular tear and a broad based disc bulge and degenerative disease at L5-S1 with mild bilateral foraminal narrowing. (R. at 139-40, 169-170.)

Miller attended physical therapy at Professional Therapies from April 27, 2005, to May 19, 2005. (R. at 176-82.) Therapist Ron Greer reported that Miller attended five visits and canceled three visits. (R. at 177.) After five total visits, Miller informed Professional Therapies that his physician requested that he put physical therapy on hold. (R. at 177.) Greer noted that Miller made functional improvements throughout the therapy. (R. at 177.)

On May 23, 2005, Miller presented to Dr. Joiner with increased cervicothoracic pain. (R. at 130-31.) Miller reported that his neck "gave out on him" twice since his last visit and that his lower back pain was constant with occasional radiation of sharp pain into his left buttock. (R. at 130.) Miller's neck exam revealed tenderness upon

12

palpation and a good ROM. (R. at 130.) Miller's spinal exam revealed no visible or palpable bony abnormalities, no pathologic curves, decreased lumbar lordosis, tenderness in the paraspinal area and soft and supple muscles. (R. at 131.) A straight leg raise test was negative and Miller's deep tendon reflexes were 2/4. (R. at 131.) Dr. Joiner diagnosed Miller with chronic lower back pain, multilevel degenerative disc disease with bulging at L4-5 and L5-S1 and chronic cervicothoracic myalgia. (R. at 131.)

On June 13, 2005, Dr. Joiner performed an epiduralgram and a transforaminal epidural steroid injection to the L4-5 level of Miller's spine. (R. at 128-29, 137-38.) Miller reported pain relief following the procedure. (R. at 128, 137.) Miller presented to Dr. Joiner for a follow-up and another epidural steroid injection on June 27, 2005. (R. at 125-27, 134-36.) On that date, Miller indicated that he had complete relief of his back pain approximately two to three days after his last epidural steroid injection, but noted that his neck pain was still present. (R. at 125, 134.) A letter dated June 27, 2005, from Dr. Joiner to Dr. Leipzig also indicated that Miller reported complete resolution of his lower back pain. (R. at 133.) Miller again presented to Dr. Joiner on August 4, 2005, for a follow-up on his lower back and neck pain. (R. at 122.) Miller reported that his neck pain was tolerable and that his lower back pain had returned in the past week. (R. at 122.)

On October 4, 2005, Miller presented to Dr. Joiner, complaining of a sharp, burning and aching low back pain, accompanied by a "knot" in his left lower back. (R. at 163.) Miller reported that the medications Norflex and Ultram were helping with his pain. (R. at 163-64.) Dr. Joiner's neck examination revealed soft, supple and non-

13

tender muscles and full ROM. (R. at 164.) A spinal examination revealed no visible or palpable bony abnormalities, decreased lumbar lordosis, tenderness with increased tone on the left from L3 to L5, no increased discomfort with extension past neutral, no sacroiliac joint tenderness and a negative bilateral straight leg raise test. (R. at 164.) Further, Dr. Joiner's neurological exam revealed that Miller's deep tendon reflexes were 2/4 and his strength was 5/5. (R. at 164.) Dr. Joiner diagnosed Miller with a mild exacerbation of his chronic lumbar spasms, degenerative disc disease, disc bulges at L4-5 and L5-S1, mild bilateral neuroforaminal stenosis at L5-S1 and controlled neck pain. (R. at 164.)

Miller returned to Dr. Joiner's office on January 18, 2006, complaining of increased lower back pain. (R. at 160-62.) Miller reported he had been walking three to four days a week and that each time he walked about one to two miles. (R. at 160.) Miller noted that he had "stabbing" lower back pain, which radiated into his hips, when he walked up hills. (R. at 160.) Miller reported that his medications were not helping as much as before, and that he was doing an independent exercise program. (R. at 160.) Miller's spinal examination revealed minimal paraspinal and gluteal tenderness, no increased discomfort with extension past neutral, no sacroiliac joint tenderness and a negative bilateral straight leg raise test. (R. at 161.) Further, Dr. Joiner's neurological exam revealed that Miller's deep tendon reflexes were 2/4 and his strength was 5/5. (R. at 161.) Dr. Joiner diagnosed Miller with an exacerbation of his lower back pain and degenerative disc disease at L4-5 and L5-S1. (R. at 162.) Joiner was given an anti-inflammatory and steroid injection to help with his pain. (R. at 162.)

14

Dr. Tony Constant, M.D., a state agency physician, completed a physical residual functional capacity assessment on July 6, 2005. (R. at 22, 147-53.) Dr. Constant concluded that Miller could occasionally lift and/or carry items weighing up to 20 pounds and frequently lift and/or carry items weighing up to 10 pounds, could sit, stand and/or walk for a total of about six hours in a typical eight-hour workday and that Miller had unlimited abilities to push and/or pull. (R. at 148.) The assessment also noted that Miller could occasionally climb stairs and frequently use ramps, but that Miller should never climb ladders, ropes or scaffolds. (R. at 149.) The report revealed that Miller could frequently balance and could occasionally stoop, kneel, crouch and crawl. (R. at 149.) No manipulative, visual, communicative or environmental limitations were noted in the report, with the exception that Miller should avoid even moderate exposure to hazards such as machinery and heights. (R. at 150.) Dr. Constant concluded that the medical evidence established a medically determinable impairment of degenerative disc disease and that, based on the evidence of record, Miller's statements were found to be partially credible. (R. at 153.) The report also noted that Miller described daily activities that were significantly limited, which was consistent with the limitations indicated by other evidence in the case. (R. at 153.) Dr. William W. Martin, Jr., M.D., another state agency physician, reviewed the assessment and affirmed the findings of Dr. Constant on September 16, 2005. (R. at 153.)

## II. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2007); *see also Heckler v. Campbell*, 471 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the

15

Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520 (2007). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2007).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. If the claimant is able to establish a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the claimant maintains the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A) (West 2003 & Supp. 2007); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated January 19, 2006, the ALJ denied Miller's claim. (R. at 12-20.) The ALJ found that Miller met the insured status requirements of the Act through December 31, 2008. (R. at 16-20.) The ALJ determined that Miller had not engaged in substantial gainful activity at any time relevant to his decision, and that Miller had severe impairments of "degenerative disc disease in [his] cervical and lumbar spine with disc bulges." (R. at 16-20.) The ALJ also found that Miller did not have an impairment or combination of impairments that meets or medically equals the criteria of any impairments listed at or medically equal to one listed at 20 C.F.R. Part 404,

16

Subpart P, Appendix 1.  (R. at 16-17.)

The ALJ determined that Miller had the residual functional capacity, ("RFC"), to sit, stand and walk up to six hours in a typical eight-hour workday, and that Miller could lift and carry items weighing up to 10 pounds frequently and 20 pounds occasionally.  (R. at 17.)  The ALJ further determined that Miller could not climb ropes, ladders or scaffolds, but could occasionally climb stairs and ramps and could stoop, kneel, crouch and crawl.  (R. at 17-18.)  The ALJ found that Miller could tolerate exposure to hazards such as heights and moving machinery.  (R. at 17-18.)  The ALJ also found that Miller was unable to perform any of his past relevant work.  (R. at 18.)  Based on Miller's age, education, work experience and RFC, along with expert vocational testimony, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Miller could perform.  (R. at 19-20.)  Thus, the ALJ found that Miller was not disabled at any time through at least the date of the ALJ's decision.  (R. at 20.)  *See* 20 C.F.R. § 404.1520(g) (2007).

Miller argues that the ALJ's decision was not supported by substantial evidence.  (Brief in Support of Plaintiff's Motion for Summary Judgment, ("Plaintiff's Brief"), at 4-9.)  In particular, Miller first argues that the ALJ did not properly evaluate Miller's ability to function in light of the cumulative effect of his pain.  (Plaintiff's Brief at 5-9.)  Miller also argues that the ALJ did not consider the combined effect of both Miller's severe and non-severe impairments, as required by Social Security Ruling 96-8p.  (Plaintiff's Brief at 9.)

The court's function in this case is limited to determining whether substantial

17

evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, provided that his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). The ALJ must indicate explicitly that he has weighed all relevant evidence and must indicate the weight given to the evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979.) While an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

Miller's first argument is that the ALJ erred by not considering his pain's cumulative effect on his ability to function. (Plaintiff's Brief at 5-9.) I disagree. The ALJ's opinion contains a thorough discussion of Miller's pain. In his opinion, the ALJ stated that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other

18

evidence." (R. at 17.) The ALJ considered Miller's testimony that he has "constant pain in his neck to his shoulders" and considered Miller's testimony that he "has low back pain every day that radiates to his buttocks and into his legs." (R. at 17.)

However, the ALJ noted that Miller testified that injections help relieve his pain. (R. at 17.) The ALJ also noted that, "such pain and other symptoms . . . responded to treatment." (R. at 17.) Moreover, the ALJ noted that "with regard to [Miller's] neck and arm pain, treatment records reflect that [Miller] presented in March 2004 with complaints of severe neck and arm pain . . . [h]owever, by May 17, 2004[, Miller] denied chronic pain and an examination at that time revealed no weakness or impairment in grip or grasp." (R. at 17.) The ALJ also noted that, "[s]ubsequent treatment records reflect that [Miller] admitted that his pain was controlled . . . ." (R. at 17.)

After a thorough review of Miller's neck and arm pain, the ALJ thoroughly discussed Miller's low back and leg pain in light of Miller's daily activities and his complaints to his physicians. (R. at 18.) The ALJ noted that after treatment of Miller's low back and leg pain, he discontinued his medications due to improvement and cancelled his remaining physical therapy appointments. (R. at 18.) The ALJ also noted that "despite [Miller's] alleged pain and other symptoms, [Miller testified] that he can write . . . drive, shop [], perform light household chores, mow the lawn with a riding mower and walk one to two miles a day three to four days a week for exercise . . . . " (R. at 18.) Further, the ALJ determined that while Miller's medically determinable impairments could reasonably be expected to produce his alleged symptoms, Miller's statements regarding the intensity, duration and limiting effects of

19

his symptoms were not entirely credible.  (R. at 17.)  Thus, I find that the ALJ thoroughly and properly considered the cumulative effect of Miller's pain.  There is substantial evidence in the record to support the ALJ's conclusion that Miller's pain does not preclude him from performing the jobs identified by the vocational expert, namely non-emergency dispatcher, cashier and security guard.

Miller's second argument is that the ALJ did not consider the combined effect of both Miller's severe and non-severe impairments, in light of Social Security Ruling 96-8p. (Plaintiff's Brief at 9.)  The United States Court of Appeals for the Fourth Circuit has noted that if a claimant has more than one allegedly disabling ailment, the Secretary must consider not just the disabling effect of each ailment in isolation, but also the cumulative effect upon the claimant. *See Combs v. Weinberger*, 501 F.2d 1361, 1363 (4th Cir. 1974); *Lackey v. Celebrezze*, 349 F.2d 76, 79 (4th Cir. 1965). Further, Social Security Ruling 96-8p states that "[i]n assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  Social Security Ruling (SSR) 96-8p, 1996 SSR LEXIS 5, *14.  In this case, the ALJ cited Social Security Ruling 96-8p in his opinion, recognizing that when determining Miller's RFC, he "must consider all of the claimant's impairments, including impairments that are not severe." (R. at 15.) (other citations omitted).  After recognizing his duty to consider the combined effect of both Miller's severe and non-severe impairments, the ALJ's opinion provides a thorough discussion of all Miller's symptoms and impairments, including his degenerative disc disease, disc bulges, gout, and his neck, arm, leg and lower back pain.  (R. at 15-19.)  Miller's application for DIB alleges disability due to a compressed disc in his back, pinched nerves and flare up of gout.  (R. at 14.)  In

20

addition to discussing several other impairments, the ALJ thoroughly discussed all of the impairments that Miller alleged in his application and further noted that he considered their combined effect. (R. at 15-19.) Thus, I find that the ALJ complied with Social Security Ruling 96-8p. The ALJ's findings must be affirmed when, as here, they are supported by substantial evidence. *Blalock v. Richardson*, 483 F.2d 773, 777 (4th Cir. 1972).

## IV. Conclusion

For the foregoing reasons, I sustain the Commissioner's Motion for Summary Judgment and overrule Miller's Motion for Summary Judgment. The Commissioner's decision denying benefits is affirmed.

An appropriate order will be entered.

**ENTER**: This _8th_ day of January 2008.

THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE

21